UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
DR. CLYDE PEMBERTON,                                         :
                                     Plaintiff,              :
            -against-                                        :    18 Civ. 7908 (LGS)
                                                             :
CITY OF NEW YORK, et al.,                                    :    **ORDER**
                                     Defendants.             :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

WHEREAS, on November 10, 2023, the parties submitted the attached deposition designations for unavailable witnesses Kasseem Reddick and Gizelle Gant. The parties' objections and responses, as well as the Court's rulings on those objections, are noted in the margins. It is hereby

**ORDERED** that the rulings shall apply to any deposition testimony offered on behalf of witnesses Reddick and Gant during the trial.

Dated: November 13, 2023
       New York, New York

                                                        _____
                                                        **LORNA G. SCHOFIELD**
                                                        **UNITED STATES DISTRICT JUDGE**

G. GANT

1    Q.    -- to the 911 operator rather?

2    A.    No. I don't recall.

3    Q.    So these women are hurling these racial slurs.
4 Was anyone responding?

5    A.    I'm sure they were. I'm sure, but I don't
6 remember.

7    Q.    Were there any other patrons at the establishment
8 that were still there at that point?

9    A.    No. I don't remember seeing anyone I
10 had to worry about because I know I probably
11 worried about those patrons and making sure
12 gotten out.

13    Q.    Do you recall what event or events
14 that night?

15    A.    I don't remember.

16    Q.    What's the next thing that you recall from that
17 incident?                          OVERRULED.

18    A.    I do believe we got somebody on the phone, 911 or
19 whoever, a dispatcher to come, and I was like okay. Then
20 I'm going back into this whole situation. There's a chair
21 that's happened -- the older one is sitting in the chair
22 now I do believe, and I'm asking if she needs water and
23 trying to defuse the situation asking the other two does
24 she need water, let's just focus on her right now, what
25 does she need because she looks a mess. She's about to,

---

**Annotations:**

[Red box, right]: Defendants also object to 22:18-23:8 on relevance grounds. The specific alleged actions of the complainants toward this non-party witness are not relevant to the assessment of probable cause, are cumulative of other testimony from this witness and others, and potentially confusing to the jury given the lack of clarity as to what events the witness is describing

[Red box, left]: The testimony at 22:18-23 is directly relevant to the state of the women who were allegedly prevented from leaving MIST.

G. GANT

1   A.   I don't recall.
2   Q.   Okay. When you go outside you described the
3   scene at mayhem?
4   A.   Yes.
5   Q.   What do you mean by that?
6   A.   The police are there, we're trying -- I see
7   people trying to explain excitedly what's happening, what's
8   going on. That sort of -- if you're exiting it's sort of
9   happening a little to the left. To the right the EMTs are
10  there and some police and EMTs are laughing because the
11  brown haired woman is pushing, and calling them names, and
12  fighting them. And they're saying that she needs to get
13  into the ambulance and she's like I'm not doing anything
14  and running around, pushing them, doing all this other
15  stuff. And they're laughing and they think it's funny.
16  Q.   She was pushing the police and E[MTs]
17  A.   Mm-hmm.
18  Q.   Both the police and EMTs or one
19  A.   I'm not quite sure.
20  Q.   Okay.
21  A.   Somebody in uniform she was push[ing]
22  Q.   Okay.
23  A.   And everybody was laughing. The blonde haired
24  one, her back was against the wall and she was being very
25  quiet and just looking like she wanted to cry. Which is

[Left margin annotation:] Plaintiff opposes Defendants' objection, which gives no basis for any arguments as to relevance, hearsay, or prejudice. The testimony is directly relevant to the state of the complaining witnesses when Defendants believed they had probable cause, and none of the testimony is being offered for the truth of the matters asserted.

[Right annotation:] OVERRULED.

[Right annotation:] Defendants object to 27:2-15 ; Fed. R. Evid. 402, 403, and 802. This description of events which occurred after the commission of the events is not relevant to the assessment of probable cause, contains speculation as to the state of mind of unidentified persons, and is potentially confusing due to the vagueness of the events described.

> [Plaintiff's margin note:] Plaintiff opposes Defendants' objection, which gives no basis for any arguments as to relevance, hearsay, or prejudice. The testimony is directly relevant to the information the Defendants had when they arrested Plaintiff, and thus the state of mind of the Defendants at the time Plaintiff was arrested, which is not hearsay. *See, e.g., Guerrero v. City of New York*, No. 14-CV-8035 (VSB), 2018 WL 4333985, at *9 (S.D.N.Y. Sept. 11, 2018).

> [Defendants' margin note:] Defendants object to 31:4-15; Fed. R. Evid. 402, 403, and 802. What this witness said to an unidentified officer is not relevant to the assessment of probable cause nor is her opinion as to the fairness of the arrests.

> **OVERRULED.**

```
 1   everyone was -- everyone was heightened, so I'm not quite
 2   sure what she said, how she said it.  She could have been
 3   just whatever.  I'm not sure.
 4        Q.   I know you don't remember who you spoke to, but
 5   do you recall what you said when you spoke to the person
 6   who was the police officer?
 7        A.   Paraphrasing?
 8        Q.   Sure.
 9        A.   Okay.  Sorry about that.
10        Q.   That's okay.  It's two years ago.  I get it.
11        A.   That we called them, we were trying to get them
12   here for a while, and these women were doing X, Y, and Z.
13   They were pushing, kicking, they were hurling abuses, and
14   this is -- and you guys are going to go and arrest whoever
15   This is not fair.  And it just became something else.
16        Q.   So was that a conversation you had after
17   Mr. Debnam and Mr. Baptiste had been arrested?
18        A.   Yes.
19        Q.   And had Dr. Pemberton already been arrested when
20   you had that conversation?
21        A.   Yes.
22        Q.   Did you ever come to see that the blonde woman
23   was arrested?
24        A.   Yes.
25        Q.   Okay.  What did you see in terms of that?
```

```
 1      A.      Yes.

 2      Q.      Do you recall if they left a tip?

 3      A.      Yes.

 4      Q.      While they were sitting there, did you overhear

 5  any of their conversation, that you can remember?

 6      A.      Well, one of the ladies was t

 7  because she was the one ordering the ro

 8  coming to speak to me, I don't remember

 9  it was or exactly what she was talking

10              But, it was, like, good energ

11  that something was going on because the

12  other drinks like they was buying round

13  round.  So, they was having a good time

14  exactly what was going on.

15      Q.      Let me ask you this, can you briefly describe any

16  of them sitting here today, what they looked like?

17      A.      I think one was short and heavyset and two was

18  slim.  I can't remember hair, but like I wouldn't be able

19  -- I don't think I would be able to exactly remember if I

20  seen them.  It might come back to me like oh, yeah.

21              I was with them most of the night because they

22  was at the bar, but something that took place that wasn't

23  really known about originally is that they was drinking

24  before they came to the main bar.  They was drinking in the

25  cafe originally first and we didn't find out until after
```

Annotations:

[Left margin, red box]: Plaintiff opposes the objection and disagrees with the proposed alternative.

The testimony is directly relevant to the state of the women who were allegedly prevented from leaving.

Any out of court statements in the statement are not offered for the truth of the matters asserted, but in the alternative, are not grounds to exclude the rest of the testimony.

[Right side, red box]: Defendants object to 10:15-11:9; Fed. R Evid. 402, 403, and 802 (implicates hearsay statements of others).  The thrust of this testimony concerns information this witness purports to have learned about the complainants from unidentified persons at an unknown time.  To the extent this is offered as evidence of the complainants' state it is clearly offered for the truth of the matter asserted.  The admissible portions of this designation are largely duplicated at 11:12-12:2, which defendants propose as an alternative.

[Right side, green text]: Objection sustained from 10:22 ("But something . . .) to 11:6. Otherwise overruled.

1    the incident happened.
2              And people was talking about what happened, that
3    I found out that before they even came to the main bar and
4    this is the reason why I believe they were intoxicated on
5    the level they was because they had a few rounds before
6    they even made it to the main bar.
7              And I know with me they had at least four or five
8    rounds because their bill was at least a hundred and
9    something dollars and I know she tipped me at least $20.
10       Q.    Do you remember which one paid the bill?
11       A.    I believe it was the heavyset one.
12       Q.    So, they've been described to me by other people
13   as a blonde one with blonder straight hair, curly haired
14   woman who someone told me looked like she might have been
15   Mexican and the third one like older, like, was the oldest
16   of the three.  That's how they've been described to me.
17             I'm not representing that that's what they
18   actually look like, but based on those descriptions, does
19   that comport with your general recollection of them?
20       A.    Yeah, I think one of them I thought was Spanish,
21   yes, but I wouldn't be able to give you -- like, it was a
22   long time ago.  The only reason is because there was an
23   incident I actually remember, but I try and be tentative
24   with the customers especially if they are tipping trying to
25   remember if they come back, to give them the same good

*Objection sustained re 11:12 - 18; Otherwise overruled.*

> Plaintiff opposes the objection. The objection as to the testimony "tak[ing] the form of a narrative" is not a proper ground to exclude the testimony.
>
> Any out of court statements in the testimony are not offered for the truth of the matters asserted, but in the alternative, are not grounds to exclude the rest of the testimony.

1  was drinking a white wine and they went one round, two
2  rounds, three rounds and then later on they was there
3  talking, laughing for the whole night.
4     Q.    And at some point there was, I'm calling it an
5  incident?
6     A.    Yes.
7     Q.    Tell me what you remember of what happened?
8     A.    Okay. So, I remember one of the young ladies I
9  believe her name was -- her -- I don't know her real name,
10 but one of the girls that worked there her name was Luna.
11       She came to me and asked me for a bottle of water
12 and I asked her, "what's going on?" And she was like, "one
13 of the female -- one of the customers they're under the
14 influence in the bathroom and they need water." So I gave
15 her the water.
16       Then one of the other girls came and was like,
17 "they need a cab, do you know a New York cab number?" I'm
18 from New Jersey so I didn't know, so I asked somebody else
19 and then one of the owners, Ms. Long, Jackie Long, she came
20 to the bar and told me to give her a bottle of water as
21 well and told me that one of the patrons was in the
22 bathroom and that they was under the influence.
23       They was discombobulated. They couldn't
24 physically move, they was in bad shape. So, I was
25 basically cleaning up the bar, wrapping up for the night

> Defendants object to 14:8-15:18 as it contains hearsay and takes the form of a narrative.

> Objection sustained from 14:18 to 14:24 to "shape." Otherwise overruled.

DIAMOND REPORTING  (877) 624-3287  info@diamondreporting.com
14

KASSEEM REEDICK

1   A.   They just -- there wasn't really a say anything
2   situation.  It was basically Dr. Pemberton said they're not
3   suppose to leave because this lady needs medical treatment.
4        These ladies trying to take this lady out without
5   getting medical treatment, so basically everybody -- he's
6   the owner of the establishment, most places you assume that
7   once somebody drop like that 'cause on numerous occasions I
8   had paid for Ubers out of my own pocket or gotten people
9   water and made sure they were safe and good before they
10  left.
11       So, when he said it, we just assumed that
12  whatever he said was right.  He's an owner, he's very
13  educated.  He's a doctor, he said she needed medical
14  treatment, so that's what we was persuing to try and get
15  her the medical treatment she needed.
16  Q.   The women who were trying to leave that they were
17  preventing -- that he was preventing from leaving, was that
18  the real sick woman or the other women?
19       MS. SAYLOR:  Objection.
20       MS. FUDIM:  I'll rephrase the question.
21  Q.   Who was it that you saw him physically try to
22  prevent from leaving?
23       MS. SAYLOR:  Objection, you can answer.
24  A.   Wait, say the question the again, that objection
25  just distracted me.

*Objections in the transcript should not be included. Exclude 20:16-20, 20:23-21:5.*

KASSEEM REEDICK

1      Q.      What -- I didn't follow all the hes.

2              So, you felt like whatever the police officer

3   said to you might be trouble, so you went back inside?

4      A.      Yes.  And this was basically now at this point

5   everybody was outside and the lady was in the ambulance.

6   She was causing some type of disturbance at that point with

7   the ambulance people.

8      Q.      When you talked to the -- well, did you talk the

9   officer inside or outside?

10     A.      I talked to the officer -- I remember talking an

11  officer outside.

12     Q.      Was it the white shirt or a different one?

13     A.      No.  It wasn't the white shirt, it was one of the

14  other officers.  He had a jacket on that night I believe he

15  was about to officer.

16     Q.      And did he ask you any questions about, like,

17  what these ladies were drinking or if any of, like, had

18  taken anything that you saw or anything about that?

19     A.      No.

20     Q.      Did you see Dr. Pemberton have a conversation

21  with any of the officers?

22     A.      Yes.  He was speaking to the police.  I seen him

23  trying to explain that he was the owner and stuff like

24  that.

25              When Dr. Pemberton was talking to them, they

[Plaintiff opposes the objection. The testimony is not speculation, and rather describes the declarant's observations.]

[Defendants object to 24:20-25:3 as to speculation as to the intentions of the plaintiff and police officers.]

OVERRULED.

DIAMOND REPORTING   (877) 624-3287   info@diamondreporting.com

KASSEEM REEDICK

1        What's Joel's contact?

2    A.   (929) 363-6602.

3    Q.   And he was working that night?

4    A.   Yes.

5    Q.   But, you don't know if he was bartending that
6    night?

7    A.   No, he wasn't bartending -- I don't -- no, he's a
8    bartender now, he wasn't a bartender then.  He was working
9    for maintenance at the time because we are the ones that
10   closed that's how I remember.

11   Q.   Because the two of you closed.
12        Did you hear -- so, other people who were there
13   that night have told us, you know, come in and met with us
14   and some people have said that the women were hurling like
15   racial slurs --

16   A.   They were.

17   Q.   -- did you hear that?

18   A.   Yeah, I know that for a fact, that's true.
19   That's one hundred percent true.  It started with something
20   -- it wasn't something I was familiar with, it was
21   something with a G or something.

22        And when she said it, that was another thing
23   that, like, shook the room, "okay, we're going that way
24   with it."  When you hear something racist, it's like, how
25   do you want to deal with it.  Do you want to be angry and

DIAMOND REPORTING   (877) 624-3287   info@diamondreporting.c[om]

---

- Plaintiff objects to 31:19-21 as hearsay. **OVERRULED.**
- 31:19-21 is not hearsay as it is a literal description of a word the witness heard used and is offered as evidence of his observations, not the truth of the statement being described.

KASSEEM REEDICK

1   be hostile about it or do you just want to brush it away.
2           So, when it was said it was, like, oh.  It wasn't
3   towards me, it was towards Dr. Pemberton, but we all felt
4   it.  It was, like, okay.
5       Q.   And you said the word was one you didn't even
6   know the word?
7       A.   I knew it was racist, but I hadn't heard it in a
8   while.  Like, you don't hear unless you're watching
9   something, like I try not to be around people that believe
10  or live like that.
11          So, when I heard it, I was like, "Oh," it was
12  like I hadn't heard this in a while.  Like, wow, that's
13  where you're going with it.  It wasn't the N word, it was
14  something else.  It was something I don't remember what it
15      Q.   Which one of three women said it?
16      A.   If I had to guess.
17      Q.   I don't want you to guess, if you don't know, you
18  could say you don't kn.
19      A.   I don't know, but I think it was the same one
20  that hit Doc because she was in his face, she set it off
21  basically.
22      Q.   Well, what was the affect of that, what was Dr.
23  Pemberton's reaction to that?
24      A.   His face got -- like, his fate was real serious.
25  He just looked like and everybody kind of looked around

*Plaintiff objects to 32:7-14 as hearsay.*

*OVERRULED.*

*32:7-14 is not hearsay as the witness is describing his observations and knowledge, not relaying an out of court statement for the truth of its contents.*

1   Q.   Just to clarify, you never saw anyone blocking
2   the women in exiting through the bar door?
3             MS. FUDIM:  Objection to form.
4   A.   Wait, say that again.
5   Q.   Did you ever see anyone blocking the women from
6   exiting through the bar doors?
7   A.   No.  There's another exit as well.  There's an
8   exit in the restaurant, two double doors, but it's like an
9   emergency exit.  Like, if you was in the restaurant you
10  could just walk right, but you can't get in.
11            MS. SAYLOR:  I have no further
12            questions.
13            MS. FUDIM:  I just have one follow-up.
14  FURTHER EXAMINATION BY
15  MS. FUDIM:
16  Q.   You were asked by Ms. Saylor if the bar door was
17  open and you said yes and I just want to clarify when you
18  say open, does that mean, like, physically, like, open or
19  unlock?
20  A.   It was unlocked.  Anybody could have left in and
21  out the bar at any time.
22  Q.   But, you don't mean, like, physically open, like,
23  air is coming in and out?
24  A.   No, it wasn't physically open like that, no.
25            MS. FUDIM:  I have nothing else.

Exclude 38:1-4